JULIUS BECHT V. JUDITH MARTIN AND OTHERS.

In 1840 the Congress of the Republic, by special Act, authorized the emancipation of P. M., a negro, and allowed him to remain in the Republic, with his property. At that time, and until his death, in 1863, he and a female slave cohabited as man and wife. In 1863 he executed a written instrument whereby he empowered a white man to "attend to all "of my business during my life, and to attend to the renting, or selling

" of my present homestead, after my death," and directed that the proceeds of the property, when sold, should be paid to his (so-called) wife, and, on her death, " be exhausted for the benefit of my children," who were themselves slaves. After the death of P. M., and in 1863, the white man sold and conveyed the property to the defendant, for Confederate money—the jury finding that defendant knew that his vendor was acting as trustee for the so-called wife of P. M., and their issue, by whom, in 1871, this suit was brought to recover the property. *Held,* that the instrument executed by P. M., in 1863, created a trust in favor of the plaintiffs, and though the trust was inoperative so long as they remained slaves, yet, after their emancipation, it was valid and enforceable in their favor. *Held further,* that the trustee's sale for Confederate money was illegal, and the defendant took the property burdened with the trust in favor of the plaintiffs.

APPEAL from Fort Bend. Tried below before the Hon. L. Lindsay.

The opinion of the court gives a statement of the case

*J. T. Harcourt,* and *C. H. Kendall,* for the appellant. The first error assigned is, that the court erred in its rulings, as shown by the bill of exceptions filed. The first exception was upon overruling the defendant's demurrer and special exceptions.

We respectfully submit that the allegations and admissions made in plaintiff's original and amended pleadings show that the plaintiff had no legal standing in court, and the demurrer should have been sustained.

It is alleged in the amended petition that Peter Martin was a colored person, who was allowed to be set free by act of Congress. It is denied that the said plaintiff ever consented to the sale of said property, or consented to receive any portion of the Confederate money, because, among other reasons, " they " were under such disabilities at that time from the laws of, " bondage and slavery which were still enforced against them " by the laws of Texas, that they were not allowed to contract " or enforce their rights, and so could not consent to anything, " and are not now bound by any so-called agreement then by " them made."

The time here referred to was the date of the defendant's purchase, on the 19th of August, 1863, which was subsequent to the death of Peter Martin.

It requires no argument to show that the same disabilities, which are confessed and solemnly plead by the plaintiff, would render her incapable of taking by descent, or as surviving widow of Peter Martin.

Peter Martin was himself under the ban of the law of bondage, as announced in the Dred Scott case : "Negroes are not " ' citizens ' intended to be included in the Constitution, and " can, therefore, claim none of the rights and privileges which " that instrument provides for and secures to citizens of the " United States." (Scott v. Sanford, 19 How., 404.)

Slavery *de facto* always existed in the colonies in Texas. (Guess v. Lubbock, 5 Texas, 547.) " A bequest of freedom to " slaves, where provision is not made for their removal from " the State, but which looks to their remaining here in a state " of freedom, is in contravention of the plainly declared policy " of the land, and consequently void." (Calvit v. Cloud, 14 Texas, 54 ; Philleo v. Holliday, 24 Texas, 41 ; Purvis v. Sherrod, 12 Texas, 140 ; Hunt v. White, 14 Texas, 648 ; Hilliard v. Frantz, 21 Texas, 199 ; Section 9, General Provisions of the Constitution of the Republic of Tezas, page 36, note 144, Paschal.)

There was no law for the marriage of Peter Martin with the woman Judith, and she could not, in any legal sense, claim to be the surviving widow, so as to claim the property under the law of descent and distribution. (Article 3419.) " The " *status* of heirship is fixed by the law in force at the death of " the ancestor, without reference to the *status* at any other " period." (Lee v. Smith, 18 Texas, 144.)

We think the demurrer should have been sustained and the cause dismissed; and, for the same reasons, the objection to the reading as evidence the deed to Peter Martin should have been sustained, because he was incapable of taking and holding the title.

46

The next exception taken was upon the refusal of the court to instruct the jury. as requested by the defendant. We invite attention to the numerous charges asked by defendant and refused by the court, and we respectfully submit that they present the law of the case. We readily admit that at the present day, and under the changed public policy as to slavery, the law of bondage, with all its disabilities and apparent injustice, seems too harsh and rigorous to be sustained, yet we must apply the familiar maxim, " *ita lex scripta est.*" We shall only specify here the tenth and eleventh charges, viz. :

" *Tenth.* You are charged that if you believe, from the evi-
" dence, that Judith Martin and her co-plaintiffs were negro
" slaves up to the date of the commencement of the late war,
" then you are instructed that they continued to be slaves up
" to the 19th day of June, 1865, at which time, and not
" before, the abolition of slavery took effect in Texas ; and, if
" slaves at the death of Peter Martin in 1863, they were inca-
" pable of taking and holding title to the property in contro-
" versy, as the heirs of the said Peter Martin, and you should
" find for defendant.

" Refused.

" *Eleventh.* Under the laws in force in Texas in 1863, slaves
" could not take property by descent or purchase, and all prop-
" erty acquired by them belonged to the master ; and, upon the
" death of Peter Martin in 1863, the title to all property that
" is held in his own name would immediately vest in the State,
" if he had no heirs who were free and capable of inheriting
" his property.

" Refused.    L. LINDSAY, Judge."

The time when emancipation took effect in Texas was adjudicated and fixed as the 19th of June, 1865, in the case of Hall *v.* Keese, and again in Johnston *v.* Davis, 32 Texas, 250.

Chancellor Kent, in Vol. II. of Kent's Com., 278, says : The laws of the Southern States on the subject of domestic slavery, are doubtless as just and mild as is deemed by those governments to be compatible with the public safety, or with

the existence and preservation of that species of property; and yet, in contemplation of their laws, slaves are considered in some respects, though not in criminal prosecutions, as things or property, rather than persons, and are vendible as personal estate.   " They cannot take property by descent or purchase, "and all they find, and all they hold, belongs to the master. " They cannot make lawful contracts, and they are deprived of " civil rights."   (Ib., 278.)

This was the law that should have been given in charge to the jury, and this would have determined the case in favor of the defendant.

The first instruction given by the court is the law since emancipation, under the Civil Rights Bill, but was not sound law prior thereto.

The second charge given by the court cannot be sustained by authority.   The forced construction given to the instrument in writing, executed by Peter Martin to J. S. Sullivan, is in direct conflict with the express terms of the instrument, which recites the fact that " the title to his homestead is in William " Ryon."

Peter Martin, and all claiming under him, are estopped from denying this admission.   Lord Mansfield thus states the rule; " No man shall be allowed to dispute his own solemn deed." (Bigelow on Estoppel, p. 267; Ib., 297 and 303; Scoby v. Sweatt, 28 Texas, 713.)

The question of trusts was not involved in the case, and the latter part of the charge in relation to the Confederate money consideration of an executed contract, was clearly contrary to the well-settled decisions of this court upon that point.

The third charge of the court cannot be reconciled with the facts of the case, or with the familiar rules of law governing the case.   It improperly assumes that there was a legal marriage, and that Peter Martin left a wife and children.   This was a material question to be decided by the jury.   " The court must " not assume the facts."   (Rodgers v. Broadnax, 24 Texas, 543; Thomas v. Ingram, 20 Texas, 728.)

There was no proof of a legal marriage, and under the law of bondage there could not have been a marriage that would secure any civil right or rights of property. But if capable of contracting a marriage at all, the plaintiff herself proves the pretended marriage void, because of the minority of the parties. Peter was eighteen years old, and she was but sixteen years of age. The charge further ignores the familiar rule of law that the fee cannot be in abeyance, but vests immediately upon the death of the ancestor.

*P. E. Peareson*, for the appellees. The first reported case occurring before a Texan court, involving the rights of free negroes, is found in Dallam, 497. Judge Jack uses this language : " We cannot conclude because they (free colored per-" sons) are not entitled to some particular privileges, they are, " while actually residing in our country, out of the pale of the " protection of the law, and that injuries and aggressions may be " wantonly committed on their persons and property, and that " when they ask for a redress of such grievances, they are to be " told that the gates of justice are closed against their com-" plaints." (Benton *v.* Williams, Dallam, 496.) Williams, a free colored person, sued Benton for damages for assault. Benton plead that he could not maintain the suit because of his African descent, and the demurrer of Williams to this plea was sustained. On appeal, the Supreme Court affirmed the ruling, saying : " We cannot, by sustaining defendant's plea, establish " a principle which we regard against law, contrary to the spirit " of our institutions, and in violation of the dictates of common " humanity." (Dallam, 497.)

In the case of Moore *v.* Minerva, 17 Texas, 25, before cited, the court decide that free persons of color may maintain a suit for damages in the nature of hire against a person who had held them in possession as slaves. (17 Texas, 21.)

In the case of Carter *v.* Marks, the maker of a note plead that he was a free negro man, descendant of African parents, and not competent to contract, etc. The Supreme Court say that in

order to make this plea good, it should have shown that he was of African blood within the prohibited degree; that he was not residing in Texas at the declaration of Independence, nor authorized by any act of the Texan Congress or Legislature to remain in the State. The deduction from this opinion is, then, that if he was authorized by Congress to remain, he could contract. The court further say that if the supposed analogy between an outlaw under the English system and a free negro residing here in contempt of the prohibitory laws of the State should exist, it would, no doubt, be subject to exceptions. (17 Texas, 540.)

"If a slave born in the United States be manumitted, or " otherwise lawfully discharged from bondage, or if a black man " born in the United States becomes free, he becomes thencefor- " ward a citizen, but under such disabilities as the laws of the " several States may deem expedient," etc. (United States v. Rhodes, 16 American L. R., 233; 1 Kent's Com., 292, note.) By our statutes, persons of African blood were prohibited from enjoying political rights, but there was no law forbidding free negroes to contract or hold property.

Aliens are made citizens by naturalization; slaves, native-born, by emancipation.

In the same case, United States v. Rhodes, it is said, "We " cannot deny the assent of our judgment to the soundness of " the proposition that the emancipation of a native-born slave " made him a citizen." "Citizenship has no connection with " the franchises of voting, eligibility to office," etc. (See also 4 Dev. & Batt, 20; 26 Indiana, 304.)

In Webster v. Heard, 32 Texas, 710, the court say: "If, how- " ever, by the will she (Betsy Webster, a person of African " blood) became a free woman, she was so in toto, and was " legally vested with the property devised to her, to use it as " she pleased, unless she was an infant," etc. (32 Texas, 710.)

And again: "Being a free woman, not under any disability " requiring a guardian, neither her former master nor the court

" had any right to appoint a guardian of her person or prop-
" erty." (Id., 711.)

And it is believed that the opinion of this court in Webster
v. Corbett, 34 Texas, 263, overruling the case just cited from
32 Texas, had reference only to the *status* of Betsy Web-
ster, under the given facts, and the laws in force in 1856, with
regard to her freedom, and was not intended to militate against
the principle that she could have held and sold property had she
in fact been, at the time, a free woman. In the first case the
court decided that she was free at the time, and therefore could
hold and sell property. In the second case the court decided
that she was not then free, and therefore could not contract,
but strongly intimates that had she been free in fact, she could
have held and sold the property. It is simply a difference of
opinion as to whether she was really a free woman under the
will, and not as to what her rights would have been had she
been in fact free at the time of her contract. " When the deed
" to Corbett was made, Betsy Webster was a slave, and could
" not make a deed." (34 Texas, 266.)

The principle decided in Purvis v. Sherrod, 12 Texas, 140,
cited with approval by this court in Webster v. Corbett, just
cited, is believed to be in substance this: That a slave could be
set free and could receive and hold realty; but—because of the
act of February 5, 1840, which forbade free negroes to immi-
grate to Texas, and required all such, excepting those who were
here at the declaration of independence, or who had remained
by consent of Congress, to remove from the republic—slaves, to
perfect their freedom and acquire title to their property, must
remove beyond the limits of the State. And it follows as a co-
rollary, that such free negroes as were here at the declaration of
independence or by permission of Congress (Hart. Dig., 2553),
could acquire property in the State, because they were not
affected by the act of February 5, 1840, which was the law
upon which was based the opinion that slaves could not be set
free and hold property in Texas. (12 Texas, 140; 24 Texas,
38; Id., 649.)

Again, by reference to the testimony of the defendant Becht himself, it will be seen that he knew that he was buying Peter Martin's title from Peter Martin's agent or trustee, the property being sold for the benefit, as he was told, of Peter's wife and children, and as Peter's property. How, then, can the defendant, who pleads his conveyance from Peter Martin's representative or trustee, dispute the title of Martin, not showing or relying on any other or outstanding title? (8 Iredell, Law, 280 ; Laws 12th Leg., 2d session, 1871, page 3, chapter 4.)

The third instruction asked by defendant was, that the court should instruct the jury that " the effect of the special act of " Congress did not manumit Peter, but only gave its consent " that his owner should or might be authorized to do so, and " after which Peter might be permitted to remain in Texas " until Congress shall direct otherwise."

This proposition is liable to the same objections as the second one, viz. : that the effect of the special act had already been explained to the jury by the court in the first general charge, and that a portion of the instruction asked had no bearing on the facts of the case, as there was no evidence whatever to show that Congress had ever " directed otherwise." Congress did not " direct otherwise " by the act of February 5, 1840—first, because ·that was a general law, and it could not apply to one secured against its effects by a special act (28 Texas, 726 ; 5 Texas, 454–7 ; Const. Rep., Section 6, Dec. Rights) ; and, second, because, by the very terms of that law, February 5, 1840, those free negroes who were in the republic by the consent of Congress were not required to leave its limits. (Hart., 2553.) Only those " found here without the permission of Congress," were required to leave. The general law could not be construed to repeal the special act. (5 Texas, 33 ; 20 Texas, 359 ; 31 Texas, 295 ; 8 Texas, 33 ; id., 65.)

Walker, J. In 1840 Peter Martin was the acknowledged slave of Wiley Martin. This slave had come to the country with his master before the Revolution ; and it would seem he

had endeared himself to his master, by fidelity and good conduct, to such a degree that his master, being a member of the Texas Congress, obtained a special act, which was approved by President Lamar, on the 3d of January, 1840. By this act of the Congress of the republic, Wiley Martin was permitted to manumit his slave Peter, on condition of his giving a bond in the sum of one thousand dollars, conditioned that Peter should not become a charge upon the republic, and especially upon the county of Fort Bend. On the 11th of May, 1842, Mr. Martin by deed in writing manumitted Peter, and gave the required bond. By his will, dated in 1833, which, however, was not probated until the 30th of May, 1842, he gave Peter his freedom.

It appears that Peter had, long prior to the date of his own freedom, connected himself, in such marriage as slaves were permitted to contract, with Judith, one of the appellees, Peter at the time being of eighteen years of age, and Judith but sixteen. They lived together as man and wife up to the 10th day of April, 1863, hiring the time of Judith from her master, in order that she might enjoy the society and companionship of her husband. Of this cohabitation and commerce a large family of children were born, but one of whom seems to have survived their father, and she is a party to this suit.

In 1856, Peter Martin purchased lots 11, 12, 13, and 14 in block 123, in the town of Richmond, in Fort Bend county, on which he erected houses and other improvements. Supposing that some advice he had received on the subject was reliable, and that he, though a free man of color, made free by a special act of Congress, could not hold property in his own name, he caused the title to the property he had purchased to be made to William Ryon, who held the property in trust for him and his heirs. Very shortly before his death, Peter executed an instrument of writing in the words and figures following:

"The State of Texas,
"County Fort Bend.

"I, Peter Martin, a free colored man, do hereby appoint J. S.

" Sullivan my agent and attorney, hereby revoking all former
" appointments of agents or attorneys. And I appoint the
" said J. S. Sullivan my agent for the purpose of having him
" to attend to all of my business during my life, and to attend
" to the renting or selling of my present homestead in Rich-
" mond, after my death. I also own one cow, branded and
" marked as the stock of Mrs. Polly Ryon, and counter-brand-
" ed with my brand, together with the increase of two or three
" calves, all in my brand, which stock I also wish my agent to
" sell. My instructions to my agent are, that, so soon as my
" homestead, the *title to which is in William Ryon,* and the
" stock shall be sold, he shall take charge of the purchase-money,
" and keep the same, or put out safely at interest, and pay out
" of it to my wife, from time to time, such sums as she may
" need, until the same is exhausted; and in the case of her
" death, any balance that may be on hand is to be exhausted
" by my agent for the benefit of my children:—I hereby giv-
" ing to my said agent full and ample power to perform all the
" above named business.

" Witness my hand, this second day of April, A. D., 1863.

                                       his
                            " PETER ⋈ MARTIN.
                                      mark.

" Witness :
        " J. A. JONES,
        " G. W. DAVIS."

It was probably in pursuance of the duties and trust pointed
out in this instrument, that Ryon deeded the property on the
18th day of August, 1863, to Sullivan; and Sullivan, on the
day following, in consideration of two thousand two hundred
and fifty dollars, in Confederate money, sold and deeded the
property to Julius Becht.

It now becomes necessary for us to determine what was the
*status* of the appellees, at the time of Peter Martin's death and
the execution of the several deeds referred to.

Peter Martin died subsequent to the emancipation proclama-
tion of President Lincoln, and it has been and may still be con-

tended, by the ablest jurists of the country, that the emancipation of the slave should date from the date of the executive proclamation. The question has been otherwise decided from this bench by a majority of the court, and whatever may now be the individual conviction of the writer of this opinion, it is unnecessary here to review the former opinion of the court. But it has always seemed to my own mind, to be little short of an absurdity to fix the date of emancipation upon that of the field order of a subordinate military commander, in preference to the date of the executive proclamation, the surrender at Appomattox, and the adoption of the thirteenth amendment to the Constitution; either of which dates would be more appropriate, give greater dignity to the event, and stand upon a much more logical foundation.

We think the instrument of writing executed by Peter Martin just before his death, should be treated as the declaration of a trust. Judge Sullivan, the trustee, evidently so understood it. Whether, then, Judith Martin and her children were slave or free at the date of Peter's death, and at the execution of the deed, it matters not. It was settled in Purvis v. Sherrod, 12 Texas, 168 (which case was followed in Webster v. Corbett, 34 Texas, 263), that a slave could be made the beneficiary in a trust, and the trust abide the change of condition—such as the freedom of the slave and removal from the State—to become effective as a bounty to the slave.

Apply the principle to this case. The trust was declared by the deed to Sullivan. The deed from Ryon to Sullivan vested the property in him, subject to the trust; and although Judith and her children may have been slaves at the time, on their emancipation they became entitled to the bounty—the trust became effective for their use.

But one more question remains to be disposed of in this case. The property was sold to Becht for Confederate money. The sale was illegal; and the property is not discharged of the trust, in his hands.

The question of rents and profits and improvements is prob-

ably fairly settled by the verdict of the jury, and the judgment of the court.

This case has been managed with great ability throughout, reflecting much credit upon the able counsel on both sides. It now becomes our duty to affirm the judgment of the District Court.

Affirmed.